1

2

3

4

5

6
UNITED STATES DISTRICT COURT

7
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
JOE J.W. ROBERTS, JR.,

9
                                    Plaintiff,                Case No. C19-0014-MJP-MLP

10
             v.

11
VILMA KHOUNPHIXAY, *et al.*,                REPORT AND RECOMMENDATION

12
                                    Defendants.

13

14
## I.      INTRODUCTION AND SUMMARY CONCLUSION

15
        This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff Joe Roberts is

16
currently confined at the Monroe Correctional Complex ("MCC") – Special Offender Unit

17
("SOU"). Plaintiff alleges in his complaint that Defendants, all of whom are mental health

18
providers or correctional officers at MCC, violated his rights under the Eighth Amendment by

19
failing to properly respond to his mental health needs. (*See* Dkt. # 9 (Compl.).) Plaintiff also

20
alleges that Defendants failed to provide proper care in retaliation for Plaintiff having filed a

21
previous lawsuit against two of the Defendants named in this action, Vilma Khounphixay and

22
Lindsay McIntyre, both of whom are Psychology Associates at MCC. (*See id*.) Finally, Plaintiff

23

REPORT AND RECOMMENDATION
PAGE - 1

alleges that Defendants denied him his right of access to the courts by fabricating and falsifying

his conditions of confinement. (*Id*.)

In addition to Psychology Associates Khounphixay and McIntyre, Plaintiff also identifies

as Defendants in his complaint Psychologist Eric Rosmith, Corrections Officers Itzel Baxter and

Deborah Farabee-Shoop, Sergeant Kevin Browne, Sergeant Robert Fuller, and Lieutenant John

Richards. (*See id*. at 1-2, 4-5.) Plaintiff seeks declaratory relief and damages. (*Id*. at 19-20.)

Defendants have filed a motion for summary judgment which is currently ripe for review.

(Dkt. # 48 (Motion).) Plaintiff has been advised of the summary judgment requirements pursuant

to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998), and has had ample opportunity to file a

response, but has failed to do so. The Court, having reviewed Plaintiff's complaint, Defendants'

motion for summary judgment, and the balance of the record, concludes that Defendants' motion

should be granted, and that Plaintiff's complaint and this action should be dismissed with

prejudice.

## II.    BACKGROUND[1]

Plaintiff has been in the custody of the Washington Department of Corrections ("DOC")

since October 2016. (Declaration of Dianna Rule (Rule Decl.) ¶ 3.) On December 3, 2018,

Plaintiff was transferred to the MCC – Intensive Management Unit ("IMU") from another DOC

---

[1] Defendants cite to Plaintiff's complaint as "ECF 9" throughout their summary judgment motion. However, the accompanying paragraph citations do not consistently correspond to the relevant paragraphs of Plaintiff's original complaint. Rather, the citations appear in a number of instances to correspond to the relevant paragraphs of Plaintiff's proposed amended complaint (dkt. # 33) which was stricken in September 2019 on motion of Defendants (dkt. ## 34, 45). This Court's citations all correspond to the relevant paragraphs of Plaintiff's original pleading.

REPORT AND RECOMMENDATION
PAGE - 2

facility. (*See* Compl., ¶¶ 14, 16.) The series of events giving rise to this action began the following day and continued through December 18, 2018.

On the morning of December 4, 2018, Plaintiff believed he had been given the wrong meal for breakfast and he complained to the correctional officer delivering the food that he should have received a mechanical soft breakfast in accordance with his approved Health Status Report. (*Id*.) Plaintiff claims that the officer rudely advised him there was no soft diet for the breakfast meal and he maintains that he was thus denied his approved diet. (*Id*.) Plaintiff asserts that this interaction made him "feel horrible" so, after trying unsuccessfully to calm himself down, he pushed the emergency button in his cell and reported to the booth officer that he felt suicidal. (*Id*., ¶ 17; *see also* Dkt. # 9-1, Plaintiff's Exhibits (Plf's Exs.) at 18.)

Defendant McIntyre, a member of the MCC mental health staff, was contacted by the booth officer and notified that Plaintiff was reporting he felt suicidal. (Dkt. # 56, Declaration of Lindsay McIntyre (McIntyre Decl.), ¶ 6 and. Ex. A-1.) Defendant McIntyre responded to Plaintiff's cell at approximately 6:45 a.m. and Plaintiff reported he was feeling depressed and vulnerable. (*Id*.) Defendant McIntyre advised Plaintiff she would be his mental health counselor and they would meet once a week for therapy sessions. (*Id*.) They also discussed Plaintiff's safety and, according to Defendant McIntyre, Plaintiff told her he had no thoughts or plans for self-harm or harming others at that time. (*Id*.) Defendant McIntyre told Plaintiff she would check in with him later in the day after reviewing his records, and she confirmed with him again that he was not at risk of self-harm at that time. (*Id*.) In contrast to Defendant McIntyre's description of their initial encounter on the morning of December 4th, Plaintiff claims he told Defendant

REPORT AND RECOMMENDATION
PAGE - 3

McIntyre that he was feeling suicidal and that she ignored him and left him alone in his cell feeling vulnerable to suicide. (Compl., ¶¶ 17, 18.)

Several hours later, Plaintiff again reported to the booth officer that he was having thoughts of self-harm. (Compl., ¶ 19; McIntyre Decl., Ex. A-2.) Defendant McIntyre responded to Plaintiff's cell at about 2:30 p.m. to speak with him again. (McIntyre Decl., ¶ 7 and Ex. A-2.) According to Defendant McIntyre, when she queried Plaintiff about his threats of self-harm, he told her he did not want to harm himself and the only way he would do so would be to use a razor to cut himself while in the shower. (*Id*.) While discussing with Plaintiff ways to keep him safe in his cell, Plaintiff suggested to Defendant McIntyre that he might need to go to the Close Observation Area ("COA"), explaining that he wanted to be off the IMU. (*Id*.) Defendant McIntyre advised Plaintiff that the COA was not a living unit but that she could modify his conditions of confinement to keep him safe. (*Id*.) Plaintiff, in turn, responded that he had "lawsuits out." (*Id*.) When Defendant McIntyre went on to explain that it was her job to keep him safe, Plaintiff started yelling and threatening to sue her at which point Defendant McIntyre walked away from Plaintiff's door. (*Id*.)

Defendant McIntyre's assessment of this interaction was that Plaintiff was attempting to manipulate a transfer to the COA in order to get off the IMU. (*Id*.) Defendant McIntyre modified Plaintiff's conditions of confinement to dress him in a suicide smock, provide him a suicide blanket, and prohibit him from possessing sharp objects, but he remained in the IMU. (*Id*., Ex. A-2.) Once again, Plaintiff's description of this encounter varies from that of Defendant McIntyre. Plaintiff claims he told Defendant McIntyre he was "having suicidal thoughts of wanting to bang [his] face into the floor," and he complains that Defendant McIntyre did not put

REPORT AND RECOMMENDATION
PAGE - 4

1   him on suicide watch or continuous observation as he believes should have occurred under DOC

2   policy. (Compl., ¶¶ 19, 20.) Plaintiff asserts that he was again left feeling vulnerable to suicide.

3   (*Id.*, ¶ 21.)

4           Approximately ninety minutes later, Defendant McIntyre was informed that Plaintiff was

5   banging his face on the floor of his cell. (McIntyre Decl., ¶ 8 and Ex. A-3.) Plaintiff

6   asserts that after Defendant McIntyre departed from her earlier visit, he was in such a state of

7   panic that he felt an uncontrollable urge to bash his head into the concrete floor and did, in fact,

8   begin doing so. (Compl., ¶ 21.) A correctional officer responded and took Plaintiff to the IMU

9   trauma room where he was assessed and treated. (*Id.*; McIntyre Decl. ¶ 8; Rule Decl., Ex. A.)

10  The attending nurse cleaned the blood off Plaintiff's face and documented a bump and

11  superficial abrasion on his head, a bloody nose and lips, and some swelling in both cheeks. (*See*

12  Rule Decl., Ex. A.) It appears that Plaintiff refused to respond to inquiries regarding the degree

13  of pain he was experiencing although he claims now that he was in excruciating pain at the time.

14  (*See* Rule Decl., Ex. A at 2; Compl., ¶ 21.) Plaintiff also claims that the nurse who treated him

15  falsified her report because she did not report any swelling, bruising or cuts when he had cuts on

16  his lips and forehead. (*Id.*) As noted above, the nurse's report documented all these injuries. (*See*

17  Rule Decl., Ex. A.)

18          At approximately 4:00 p.m., Defendant McIntyre went to see Plaintiff in the trauma room

19  where he was receiving treatment for his injuries, but Plaintiff told her he did not want to talk to

20  her. (McIntyre Decl., ¶ 8.) Defendant McIntyre again modified Plaintiff's conditions of

21  confinement – effective from December 4, 2018 at 4:04 p.m. until December 7, 2018 at 4:00

22  p.m. – to address his self-harm attempt and his risk of self-harm. (*Id.*) Plaintiff was admitted to

23

REPORT AND RECOMMENDATION
PAGE - 5

the COA and was placed on suicide watch with 15-minute safety checks. (*Id.*, ¶ 8 and Exs. A-3, A-4.)

Because of ongoing threats of self-harm, Plaintiff was placed in a restraint bed at approximately 4:20 p.m. on December 4th. (*See id.*, ¶ 9 and Ex. A-5; Dkt. # 53, Declaration of Angela Felch (Felch Decl.), Ex. B.) When Plaintiff was assessed again at 8:20 p.m. to determine if it was appropriate for him to come out of the restraint bed, Plaintiff told the mental health provider he was experiencing some ideation about killing himself by cutting his wrists, and he therefore remained in the restraint bed on continuous observation.[2] (*See* McIntyre Decl., ¶ 9 and Ex. A-5; Dkt. # 51, Declaration of Christopher Elliott (Elliott Decl.), ¶ 5 and Ex. A-1.)

The following morning, December 5, 2018, Defendant McIntyre went to visit Plaintiff and, though he was up and walking around in his cell when she arrived, when he looked at her he laid down and refused to speak. (McIntyre Decl., ¶ 10.) Defendant McIntyre modified Plaintiff's conditions of confinement to continue his suicide watch until 4:00 p.m. on December 8, 2018. (*Id.*, ¶ 10 and Exs. A-6, A-7.) Plaintiff does not acknowledge having seen Defendant McIntyre on the morning of December 5th but instead claims, contrary to Defendant McIntyre's report, that after being released from the restraint bed he went to sleep and awoke around 2:00 p.m. to discover that his suicide watch had been discontinued without anyone having conducted a psychological assessment. (*Id.*, ¶¶ 23, 24.)

Plaintiff goes on to claim that shortly after he says he awoke on the afternoon of December 5, 2018, he was feeling suicidal and noticed a hard plastic urinal in the bathroom area

---

[2] It is not clear from the record when Plaintiff was actually released from the restraint bed, but Plaintiff claims he was in restraints for 8-10 hours. (Compl., ¶ 23.)

REPORT AND RECOMMENDATION
PAGE - 6

of his cell. (Compl., ¶ 25.) Plaintiff asserts that he began to panic because he felt urges to cut himself and so he declared a mental health emergency. (*Id*.) According to Plaintiff, Defendants Baxter and Farabee-Shoop were on duty in the COA at that time, but they ignored his emergency declaration and his requests to get the urinal out of his cell. (*Id*., ¶¶ 25, 26.) When Plaintiff received no response from the officers, he asserts that he "began to try and kill [himself] by cutting [an] artery in [his] arm." (*Id*., ¶ 26.)

Defendant Farabee-Shoop was conducting tier checks in the COA when she heard Plaintiff yelling that he had a "medical health emergency" and was suicidal, and she therefore headed towards his cell. (Dkt. # 52, Declaration of Deborah Farabee-Shoop (Farabee-Shoop Decl.), ¶ 4.) As Defendant Farabee-Shoop approached Plaintiff's cell she noticed that he had blown powdered milk under his cell door and into the COA hallway. (*Id*.)

Another officer, Correctional Officer James Yadon, was also directed to respond to Plaintiff's cell because of the self-harm attempt. (Dkt. # 60, Declaration of James Yadon (Yadon Decl.), ¶ 3 and Ex. A.) As the officers approached Plaintiff's cell, Officer Yadon saw that Plaintiff had the plastic urinal in his hand and had bent it to create a sharp point which he was using to cut into his right inner arm, making it red. (*Id*., ¶ 3.) Plaintiff was given directives to stop self-harming and Officer Yadon advised Plaintiff that OC pepper spray would be used against him if he did not comply. (*See id*., ¶ 3, Ex. A.)

Defendant Farabee-Shoop opened the cuff port in Plaintiff's cell door in an effort to retrieve the urinal from Plaintiff, as Plaintiff had requested, when Plaintiff grabbed her duty belt. (Farabee-Shoop Decl., ¶ 4.) Defendant Farabee-Shoop jumped back and Officer Yadon sprayed a three-second burst of OC pepper spray in Plaintiff's general direction while attempting, without

REPORT AND RECOMMENDATION
PAGE - 7

success, to close the cuff port. (*Id.*; Yadon Decl., ¶ 3 and Ex. A.) Defendant Farabee-Shoop also began spraying OC pepper spray towards Plaintiff as she too attempted to close the cuff port. (Farabee-Shoop Decl., ¶ 4.) At that point, Defendant Farabee-Shoop slipped on the powdered milk and OC spray that were on the floor and fell to the ground. (Farabee-Shoop Decl., ¶ 4; *see also* Yadon Decl., ¶ 3 and Ex. A.) Defendant Farabee-Shoop injured her knee when she fell and crawled away from Plaintiff's cell door as Officer Yadon finally managed to close the cuff port. (*Id.*) Officer Yadon remained in front of Plaintiff's cell door until the Quick Response Strike Team ("QRST") arrived and helped put Plaintiff in restraints. (Yadon Decl., ¶ 3.)

Plaintiff asserts that during this encounter, Defendant Farabee-Shoop never asked him to stop self-harming, or to give her the urinal, and that she instead pepper sprayed him in the groin. (Compl., ¶ 29.) Defendant Farabee-Shoop, on the other hand, states that she was unable to safely remove the urinal during the encounter because of Plaintiff's "highly negative behavior," and that she never aimed her OC pepper spray at Plaintiff's groin. (Farabee-Shoop Decl., ¶¶ 4, 5.)

Following this incident, MCC staff attempted to decontaminate Plaintiff from the OC spray and then placed him in a restraint chair. (Yadon Decl., Ex. A; McIntyre Decl., Ex. A-8.) Plaintiff was also assessed by a nurse who observed superficial cuts on Plaintiff's right forearm and some bruising, but no active bleeding. (McIntyre Decl., Ex. A-8.) Defendant McIntyre also assessed Plaintiff following the incident, after he had been put in the restraint chair. (*Id.*, Ex. A-6.) Plaintiff reported to Defendant McIntyre that he had no further thoughts of self-harm and she was able to arrange for his release from the restraint chair, though he remained in the COA on suicide watch. (*Id.*)

REPORT AND RECOMMENDATION
PAGE - 8

1    Defendant McIntyre spoke again with Plaintiff on the afternoon of December 6, 2018 at

2    which point Plaintiff indicated he was ready to return to the IMU but he did not tell her he would

3    be safe. (*Id*., ¶ 12 and Ex. A-13.) Defendant McIntyre advised Plaintiff she needed to see more

4    than 24-hours of stability before returning him to the IMU and she determined Plaintiff would

5    remain on suicide watch at that time. (*Id*.)

6    On the morning of December 7, 2018, Defendant Rosmith visited Plaintiff at his cell in

7    the COA. (Compl., ¶ 30; Declaration of Eric Rosmith (Rosmith Decl.), ¶ 5.) According to

8    Plaintiff, the two discussed coping skills during the visit and Plaintiff explained to Defendant

9    Rosmith that he had suicidal ideations to slice his wrists with a razor. (*See id*.) Defendant

10   Rosmith confirms Plaintiff told him he was still having thoughts of ending his life with a sharp

11   implement, but states Plaintiff also denied at that time having either suicidal or homicidal intent.

12   (Rosmith Decl., ¶ 5 and Exs. A-1, A-2.) Plaintiff advised Defendant Rosmith he would be able to

13   remain safe if he were provided some additional items that were not permitted under his existing

14   conditions of confinement, including a white top, a pair of shorts, socks, long johns, and crayons

15   and paper. (*See id*.) Defendant Rosmith modified Plaintiff's conditions of confinement to include

16   the additional items and extended his stay in the COA until 1:00 p.m. on December 10, 2018,

17   with 15-minute safety checks. (*Id*., ¶ 5 and Ex. A-2.)

18   Plaintiff complains that despite his report to Defendant Rosmith that he was having

19   suicidal ideations, Defendant Rosmith documented only that Plaintiff was at risk of self-harm

20   and self-harm attempts. (Compl., ¶ 30.) Plaintiff asserts that Defendant Rosmith's minimization

21   of the seriousness of his condition was a part of a pattern of conduct also involving Defendants

22

23

REPORT AND RECOMMENDATION
PAGE - 9

1    McIntyre and Khounphixay that denied him access to adequate treatment for his risk of suicide.

2    (*Id.*, ¶¶ 30, 31.)

3         On December 10, 2018, the day the conditions of confinement established by Defendant

4    Rosmith were set to expire, Plaintiff claims Defendant McIntyre assessed him again in the COA

5    and he reported he was feeling suicidal and depressed and so remained in the COA that day. (*See*

6    *id.*, ¶ 36.) Defendant McIntyre gives no indication as to whether she met with Plaintiff that day

7    or not and there is some suggestion in the record that Plaintiff actually refused to leave the COA

8    on December 10th, though Plaintiff denies this. (*See* Dkt. # 25 (Answer), ¶ 36; Dkt. # 55,

9    Declaration of Vilma Khounphixay (Khounphixay Decl.), Ex. A-1.; Compl., ¶¶ 36, 45.)

10         On December 11, 2018, Defendants Richards and Fuller appeared at Plaintiff's cell door

11   in the COA to escort him back to his assigned cell in the IMU. (Compl., ¶ 37; Dkt. # 54,

12   Declaration of Robert Fuller (Fuller Decl.), ¶ 4; Dkt. # 57, Declaration of John Richards

13   (Richards Decl.), ¶ 4.) According to the officers, Plaintiff told them he was going to self-harm

14   while they were in transit to the IMU, though Plaintiff disputes this. (Fuller Decl., ¶ 4; Richards

15   Decl., ¶ 4; Compl., ¶ 47.) The officers took Plaintiff to the IMU receiving area where they placed

16   him in a holding cell and called the Mental Health Department to perform a personal safety risk

17   assessment on Plaintiff. (*Id.*)

18         Defendant Khounphixay responded to the IMU receiving cell and the officers briefed her

19   on the situation before returning to their station in the SOU where the COA is located. (*Id.*;

20   Khounphixay Decl., ¶ 5.) When Defendant Khounphixay arrived at the receiving cell, Plaintiff

21   refused to talk to her and advised that because he had filed a lawsuit against her it was unethical

22   for her to assess him. (*See* Khounphixay Decl., ¶ 5; Compl., ¶ 43.) Defendant Khounphixay

23

REPORT AND RECOMMENDATION
PAGE - 10

nonetheless attempted to assess Plaintiff, but had difficulty doing so because Plaintiff kept talking over the assessment questions. (*See* Khounphixay Decl., ¶ 5 and Ex. A-1.) As Defendant Khounphixay attempted to explain that her job was to complete the assessment to determine risk factors, Plaintiff continued talking loudly over her, trying to overpower her voice. (*Id.*; Dkt. # 50, Declaration of Kevin Browne (Browne Decl., ¶ 4).) Though Defendant Khounphixay tried to complete her assessment, she ultimately walked away from the cell when she was unable to communicate with Plaintiff. (Khounphixay Decl., ¶ 5 and Ex. A-1.)

Defendant Browne, who was asked to come to the receiving cell because of Plaintiff's disruptive behavior, stepped in to try to reason with Plaintiff about complying with the assessment. (*Id.*, Ex. A-1; Browne Decl., ¶ 4.) When Defendant Browne looked through the window of the cell door, he saw Plaintiff hit his head against the window and then fall to the floor where he laid with his eyes closed. (Browne Decl., ¶ 4.) Plaintiff claims he intentionally hit his head on the door after he was moved to the IMU without a psychological assessment first having been done to determine if he was a suicide risk, and he asserts that he "banged his head so hard [he] blacked out and woke up on the floor." (Compl., ¶ 42.) Plaintiff alternatively claims that Defendant Browne harassed him so much when he came to talk to him that he "snapped and banged [his] head into the wall so forcefully hard, that [he] woke up on the ground feeling dizzy." (Compl., ¶ 43.)

According to Defendant Browne, it did not appear that Plaintiff hit his head sufficiently hard so as to render him unconscious or cause significant injury. (Browne Decl., ¶ 4.) Defendant Browne observed that when Plaintiff banged his head, he used his hands or arm to hit the door hard to give the impression of striking his head hard. (*Id.*) Defendant Browne further observed

REPORT AND RECOMMENDATION
PAGE - 11

that when Plaintiff fell to the ground, he did not fall in an uncontrolled manner but instead made sure to fall in a way that would protect his head and lessen the impact of the fall. (*Id*.) Defendant Browne states that he saw no visible wound or marking on Plaintiff's head that would likely have been present if Plaintiff had hit his head hard enough to render him unconscious. (*Id*.)

Defendant Browne advised Defendant Khounphixay that Plaintiff had hit his head but he believed Plaintiff was conscious, and Defendant Khounphixay then stepped to the cell door window and saw Plaintiff lying on the floor with his eyes closed, but his eyelids fluttering, which indicated to her he was not unconscious. (Khounphixay Decl., ¶ 5 and Ex. A-1.) Defendant Khounphixay again tried to assess Plaintiff by asking him questions, but he did not respond. (*Id*.) Defendant Khounphixay then requested a nurse who was on the unit to assess Plaintiff for head injuries, and the nurse determined the injuries were superficial. (*See id*.) After the nurse assessed Plaintiff, Defendant Khounphixay loudly stated she was going to request a restraint chair for Plaintiff to prevent further self-harm at which point Plaintiff stood up and started arguing with her. (*Id*.; Browne Decl., ¶ 4.)

Plaintiff was placed in a restraint chair under direct watch and Defendant Khounphixay imposed other restrictive conditions as well in order to prevent further self-harm. (Khounphixay Decl., ¶ 5 and Exs. A-1, A-2.) In addition to establishing conditions for the time Plaintiff was confined to the restraint chair, Defendant Khounphixay also recommended conditions of confinement to be imposed once Plaintiff was released from the restraint chair and returned to his regular IMU housing. (Khounphixay Decl., Ex. A-2, B.) The restrictions included no regular prison clothes, no regular linens, no regular food tray, no sharp objects, and no phone. (*See id*.) These modifications to Plaintiff's IMU conditions of confinement were approved by Defendant

REPORT AND RECOMMENDATION
PAGE - 12

Richards and were scheduled to end on December 18, 2018. (*See id.*, Ex. B.) Defendant Khounphixay noted on the IMU conditions of confinement form that restricted items could be reinstated once Plaintiff presented a period of stability, in particular the absence of self-harm reports. (*Id.*)

Plaintiff asserts that the conditions imposed on December 11, 2018 were extreme and that because of these restrictions, which he claims included restrictions on hygiene/sanitation items, he was unable to brush his teeth, wash his hands, or wipe himself after going to the bathroom. (Compl., ¶ 44.) Plaintiff claims that he had to use his hands to wipe himself and that he had feces smeared in his nails. (*Id.*) Notably, the conditions of confinement form completed by Defendant Khounphixay which set forth Plaintiff's IMU restrictions for the period of December 11th to December 18th did not include any restrictions on hygiene items. (*See* Khounphixay Decl., ¶ 6 and Ex. A-2.)

Plaintiff finally alleges, with respect to the conditions of confinement imposed on December 11, 2018, that Defendants McIntyre, Khounphixay, Fuller and Richards manipulated the conditions in retaliation for Plaintiff having filed an earlier lawsuit against Defendants McIntyre and Khounphixay, and he claims that the restrictions hindered his ability to litigate his other lawsuit because he was denied access to a pen which rendered him unable to file briefs in that case. (*See* Compl., ¶¶ 47, 51-53.)

### III.    DISCUSSION

#### A.    Applicable Standards

##### 1.    *Summary Judgment Standard*

Summary judgment is appropriate when a "movant shows that there is no genuine dispute

REPORT AND RECOMMENDATION
PAGE - 13

1    as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

2    56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party

3    fails to make a sufficient showing on an essential element of his case with respect to which he

4    has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving

5    party bears the initial burden of showing the district court "that there is an absence of evidence to

6    support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by

7    producing affirmative evidence that negates an essential element of the nonmovant's case, or by

8    establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of

9    persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102

10   (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of

11   material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The

12   Court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 585-87.

13         In supporting a factual position, a party must "cit[e] to particular parts of materials in the

14   record . . .; or show[] that the materials cited do not establish the absence or presence of a

15   genuine dispute, or that an adverse party cannot produce admissible evidence to support the

16   fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there

17   is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at

18   585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over

19   facts that might affect the outcome of the suit under the governing law will properly preclude the

20   entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)

21   (emphasis in original). The central issue is "whether the evidence presents a sufficient

22   disagreement to require submission to a jury or whether it is so one-sided that one party must

23

REPORT AND RECOMMENDATION
PAGE - 14

1    prevail as a matter of law." *Id.* at 251-52.

2        The opposing party must present significant and probative evidence to support its claim

3    or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

4    "The mere existence of a scintilla of evidence in support of the non-moving party's position is

5    not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d

6    1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with

7    allegations in the complaint, or with unsupported conjecture or conclusory statements."

8    *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

9                        *2.    Section 1983 Standard*

10       In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that

11   he suffered a violation of rights protected by the Constitution or created by federal statute, and

12   (ii) that the violation was proximately caused by a person acting under color of state law. *See*

13   *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is

14   satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in

15   another's affirmative act, or omitted to perform an act which he was legally required to do that

16   caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981)

17   (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

18       **B.    Analysis**

19               *1.    Eighth Amendment Claims*

20       Plaintiff alleges that Defendants were deliberately indifferent to his mental health needs

21   in violation of his rights under the Eighth Amendment. (*See* Compl., ¶¶ 16-47.) More

22   specifically, Plaintiff asserts that during the two week period at issue in this action – December

23

REPORT AND RECOMMENDATION
PAGE - 15

4, 2018 to December 18, 2018 – he notified his mental health providers that he was feeling suicidal, but they documented only that he was at risk of self-harm which he believes minimized the severity of his condition and put him at greater risk for suicide. (*See id*.) Plaintiff also complains that Defendants failed to respond reasonably to his reports of feeling suicidal, that they moved him from the COA on December 11, 2018 without first conducting a psychological assessment, that they ridiculed and harassed him and thereby put him at risk of suicide, and that they deprived him of basic human needs by unreasonably imposing extreme conditions of confinement. (*See id*.)

The treatment a prisoner receives in prison, and the conditions under which he is confined, are subject to scrutiny under the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). The Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement. *Id*. This duty includes ensuring that inmates receive adequate food, clothing, shelter, and medical care, and taking reasonable measures to guarantee the safety of inmates. *Id*. In order to establish an Eighth Amendment violation, a prisoner must satisfy a two-part test containing both an objective and a subjective component. The Eighth Amendment standard requires proof that (1) the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation; and (2) the prison official acted with a sufficiently culpable state of mind. *Id*. at 834.

The objective component of an Eighth Amendment claim is "contextual and responsive to 'contemporary standards of decency.'" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The state of mind requirement under the subjective component of the Eighth Amendment standard has been defined as "deliberate indifference" to

REPORT AND RECOMMENDATION
PAGE - 16

1    an inmate's health or safety. *Farmer*, 511 U.S. at 834. Under the "deliberate indifference"

2    standard, a prison official cannot be found liable for denying an inmate humane conditions of

3    confinement unless the official knows of and disregards an excessive risk to inmate health or

4    safety. *Id*. at 837.

5                                  i.        Defendants McIntyre, Khounphixay and Rosmith

6            Plaintiff's primary complaint about his mental health providers appears to be that they

7    improperly assessed him as wanting to self-harm instead of assessing him as being suicidal,

8    which was his preferred diagnosis. Defendant Rosmith, the MCC Psychologist, explains that

9    there is a difference between a diagnosis of wanting to self-harm and wanting to commit suicide.

10   (Rosmith Decl., ¶ 6.) In particular, Defendant Rosmith describes a significant difference in intent

11   between an individual contemplating suicide and one who engages in non-suicidal self-injurious

12   behaviors. (*Id*.) An individual contemplating suicide feels that suicide is the only realistic option

13   for them to end their suffering. (*Id*.) In contrast, non-suicidal self-injurious behavior is an

14   individual's way to cope with suffering as the self-infliction of pain allows an individual to

15   escape that suffering. (*Id*.) According to Defendant Rosmith, in a correctional setting, non-

16   suicidal self-injurious behaviors are sometimes used by individuals to influence their

17   environment and/or to get their perceived needs met. (*Id*.)

18          Plaintiff's objection to the manner in which Defendants diagnosed his mental health risks

19   during the period in question does not give rise to an Eighth Amendment violation as a mere

20   difference of opinion concerning proper diagnosis or medical care is not sufficient to establish

21   deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *Sanchez v. Vild*,

22   891 F.2d 240, 242 (9th Cir. 1989).

23

REPORT AND RECOMMENDATION
PAGE - 17

During the period in question, both Defendant McIntyre and Defendant Khounphixay opined that at least some of Plaintiff's self-harm behaviors or threats of self-harm were for purposes of achieving secondary gain, an assessment which Plaintiff finds objectionable. (*See* McIntyre Decl., ¶ 7 and Ex. A-2; Rosmith Decl., Ex. A-3; Khounphixay Decl., ¶ 5 and Exs. A-1, A-2, B.) However, regardless of how Defendants assessed or defined Plaintiff's behaviors, there is no evidence in the record that they were deliberately indifferent to Plaintiff's mental health needs. Defendants contacted Plaintiff when advised that he was making threats of self-harm, or was actively engaged in self-harming, and they took the steps deemed necessary to keep him safe based on Plaintiff's reports and/or behaviors. (*See* McIntyre Decl., ¶¶ 6-10, 12; Khounphixay Decl., ¶ 5.) Defendants consistently modified Plaintiff's conditions of confinement as his behaviors dictated, including transferring him to the COA, placing him on suicide watch, ensuring he was properly monitored, and restricting his access to items that he could use to harm himself. (McIntyre Decl., Exs. A-1 through A-7, A-13; Khounphixay Decl., Exs. A-1, A-2, B.) That Defendants did not always respond as Plaintiff would have preferred, and that Plaintiff managed to harm himself despite the efforts of the mental health staff to ensure his safety, does not give rise to a constitutional violation.

To the extent Plaintiff alleges that Defendant Khounphixay unreasonably placed him on extreme conditions of confinement on December 11, 2018, and deprived him of basic human needs, he likewise fails to demonstrate any violation of his federal constitutional rights. The evidence in the record demonstrates that Defendant Khounphixay responded to an IMU holding cell on December 11th to conduct a personal safety risk assessment on Plaintiff after he reported to Defendants Fuller and Richards, as he was being transported from the COA back to the IMU,

REPORT AND RECOMMENDATION
PAGE - 18

that he was going to self-harm. (Khounphixay Decl., ¶ 5 and Ex. A-1.) When Defendant

Khounphixay arrived to assess him – something Plaintiff argues should have happened before he

even left the COA – Plaintiff refused to speak to her, otherwise obstructed her efforts to assess

him, and then engaged in an act of self-harm; *i.e.*, hitting his head against the wall. (*See id.*)

Plaintiff was placed in restraints to prevent him from engaging in further self-harming behaviors,

and his conditions of confinement were modified to restrict access to items that could be used to

inflict further harm. (*Id.*)

Defendant Khounphixay completed two separate conditions of confinement forms that

day. (*Id.*, Exs. A-2, B.) The first set of conditions was applicable only to the time Plaintiff was

confined in the restraint chair and those conditions permitted Plaintiff no access to hygiene

items. (*Id.*, Ex. A-2.) The second set of conditions was applicable to the period of time after

Plaintiff was released from the restraint chair and returned to IMU housing, and those conditions

contained no restrictions on hygiene items, save for a razor. (*See id.*, Ex. B.) The second set of

conditions provided for the reinstatement of restricted items after Plaintiff presented a period of

stability. (*Id.*)

Plaintiff makes no showing that, given his pattern of engaging in self-harming behaviors,

it was unreasonable for Defendant Khounphixay to restrict his access to items that might be used

to inflict further self-harm. Moreover, the evidence in the record does not support Plaintiff's

claim that Defendant Khounphixay denied him access to hygiene items. If, as Plaintiff alleges,

his access to hygiene items continued to be restricted following his return to IMU housing, he

makes no showing that the restriction was attributable to Defendant Khounphixay.

REPORT AND RECOMMENDATION
PAGE - 19

1              ii.      Defendants Farabee-Shoop and Baxter

2          With respect to Defendants Baxter and Farabee-Shoop, Plaintiff alleges that these

3    individuals were on duty in the COA on December 5, 2018 when he declared a mental health

4    emergency because he was feeling suicidal and had noticed a hard plastic urinal in his cell which

5    he could use to cut himself. (Compl., ¶ 25.) Plaintiff claims that his emergency declarations were

6    ignored, that he began trying to kill himself by cutting an artery in his arm, that Defendant

7    Farabee-Shoop knew he was cutting himself but never asked him to stop or to give her the urinal,

8    and that she sprayed him in the groin with OC pepper spray instead of responding reasonably to

9    his mental health emergency. (*See id.*, ¶¶ 25-29.)

10         The evidence in the record demonstrates that Defendant Baxter was not on duty in the

11   COA at the time Plaintiff declared his mental health emergency and was not involved in the

12   incident described by Plaintiff. (Baxter Decl., ¶ 3.) Defendant Farabee-Shoop acknowledges she

13   was involved in the incident, but the evidence in the record does not support Plaintiff's claim that

14   she was deliberately indifferent to his mental health needs or to his physical safety. The evidence

15   demonstrates that Defendant Farabee-Shoop responded to Plaintiff's cell when she heard him

16   yelling that he had an emergency and was suicidal, that she attempted to retrieve the urinal from

17   Plaintiff but was unable to do so because he obstructed her efforts by reaching through the cuff-

18   port door and trying to grab her rather than turning over the urinal, and that she and Correctional

19   Officer Yadon sprayed OC pepper spray in Plaintiff's direction when he refused to stop self-

20   harming as directed and obstructed the officers' ability to close the cuff-port. (Farabee-Shoops

21   Decl., ¶¶ 4, 5.)

22

23

REPORT AND RECOMMENDATION
PAGE - 20

Defendant Farabee-Shoops and Officer Yadon deny aiming OC pepper spray at Plaintiff's groin but, given that Plaintiff was apparently naked during this episode it is perhaps not surprising that this area of his body, along with others, would have been affected by the spray. (*See* Farabee-Shoops Decl., ¶ 5; Yadon Decl., ¶¶ 4-5 and Ex. A.) Plaintiff offers no evidence that there was any intentional deployment of OC pepper spray towards his groin and, in fact, the evidence demonstrates that the OC pepper spray was deployed only after Plaintiff had been warned the spray would deployed if he failed to stop self-harming and after he attempted to grab and/or strike the officers. (Farabee-Shoops Decl., ¶ 5; Yadon Decl., ¶ 3 and Ex. A.) Nothing in these facts suggests that Defendant Farabee-Shoop engaged in any conduct violative of Plaintiff's federal constitutional rights.

### iii.   Defendants Fuller and Richards

With respect to Defendants Fuller and Richards, Plaintiff claims only that these officers escorted him from the COA to the IMU on December 11, 2018 and that they conspired with Defendants Khounphixay and McIntyre to move him off of the COA knowing that he had not been properly cleared for such a move because he had not received a psychological assessment. (Compl., ¶¶ 37, 38.) Plaintiff's claim that these two members of the correctional staff conspired with members of the mental health staff to improperly move him from the COA to his regular cell in the IMU is conclusory at best. "Vague and conclusory allegations of official participation in civil rights violations are not sufficient to support a claim for relief under § 1983." *Ivey v. Board of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). Plaintiff alleges no facts demonstrating that Defendants Fuller and Richards or, in fact, any of the four Defendants he claims conspired against him, were in any way responsible for the decision to move Plaintiff

REPORT AND RECOMMENDATION
PAGE - 21

1  from the COA to the IMU on the day in question. As to Defendants Fuller and Richards, the

2  evidence demonstrates only that these officers acted as escorts in transferring Plaintiff from one

3  part of the facility to another. (Fuller Decl., ¶¶ 3-4; Richards Decl., ¶¶ 3-4.) Such conduct is

4  insufficient to demonstrate any violation of Plaintiff's federal constitutional rights.

5                          iv.      Defendant Browne

6          With respect to Defendant Browne, Plaintiff alleges that on December 11, 2018, while he

7  was in the IMU holding cell awaiting a safety risk assessment, Defendant Browne ridiculed and

8  harassed him, and called him a faker and/or a manipulator. (Compl., ¶ 43.) Plaintiff claims that

9  Defendant Browne harassed him so much that he "snapped" and banged his head on the wall so

10  forcefully that he woke up on the ground feeling dizzy. (*Id.*)

11          Not only is this claim inconsistent with other assertions Plaintiff made in his complaint

12  regarding the cause of this self-harm incident[3], Defendant Browne's description of events, which

13  Plaintiff has not refuted, undermines Plaintiff's claim that Defendant Browne caused him to self-

14  harm. According to Defendant Browne, when Plaintiff got up off the floor after hitting his head

15  on his cell window he was very upset about something Defendant Browne had said while

16  Plaintiff was lying on the floor, purportedly unconscious, and Plaintiff accused Defendant

17  Browne of calling him a faker. (Browne Decl., ¶ 4.) Defendant Browne acknowledges telling

18  Defendant Khounphixay that he did not believe Plaintiff was unconscious when he fell on the

19  floor. (*Id.*) However, this comment, which Plaintiff appears to have found upsetting, was not

20

21  ─────────────────────
    [3] Plaintiff also claimed, in relation to this same incident, that it was his transfer from the COA to the IMU
22  without first being afforded a psychological assessment to discern if he was a suicide risk that caused him
    to bang his head so hard it caused him to black-out and wake up on the floor. (Compl., ¶ 42.)

23

REPORT AND RECOMMENDATION
PAGE - 22

made until *after* Plaintiff had already hit his head and fallen to the floor. (*See id.*) It is therefore not possible that Defendant Browne's comment *caused* Plaintiff to hit his head and fall to the floor.

It appears that Plaintiff's complaint against Defendant Browne amounts to nothing more than a claim that this Defendant subjected him to verbal harassment and abuse which is simply not sufficient to state a claim for relief under § 1983. *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987).

### 2. First Amendment Retaliation Claims

Defendants do not specifically address in their summary judgment motion Plaintiff's retaliation claims which are littered throughout his complaint. (*See* Compl., ¶¶ 32, 43, 44, 47, 51, 52, 53, 55; *see also* Plf's Exs. at 5.) Plaintiff's retaliation claims largely mirror his deliberate indifference claims in that Plaintiff attributes Defendants' failure to properly diagnose and respond to his mental health needs to the fact that he filed a prior lawsuit against Defendants Khounphixay and McIntyre. (*See id.*)

A viable claim of First Amendment retaliation within the prison context has five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).

In order to prevail on a retaliation claim, "a plaintiff must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (citation and internal quotation omitted). In addition, a plaintiff

REPORT AND RECOMMENDATION
PAGE - 23

1    "bears the burden of pleading and proving the absence of legitimate correctional goals for the

2    conduct of which he complains." *Pratt v. Rowland,* 65 F.3d 802, 806 (9th Cir. 1995). The Court

3    evaluates a retaliation claim in light of the deference accorded prison officials. *Id*. at 807.

4        Plaintiff makes no showing whatsoever that Defendants' assessments of, and responses

5    to, his mental health needs, were motivated by the lawsuit Plaintiff had previously filed against

6    Defendants Khounphixay and McIntyre. Rather, the record demonstrates that Defendants

7    responded to Plaintiff's mental health needs as necessary and appropriate in order to ensure his

8    safety and the safety of others. Plaintiff's retaliation claim fails.

9            *3.    Access to Courts*

10       Finally, Plaintiff asserts that Defendants Khounphixay, McIntyre, Fuller, and Richards all

11   manipulated and falsified his conditions of confinement for the period of December 11, 2018 to

12   December 18, 2018, and that this hindered his ability to litigate another action pending in this

13   Court, *Roberts v. Khounphixay, et* al., C18-746-MJP. (Compl., ¶¶ 47, 51-52.) Specifically,

14   Plaintiff contends that under the restrictive conditions imposed by Defendant Khounphixay, and

15   authorized by Defendant Richards, he was not allowed access to a pen and he was therefore

16   unable to file briefs he otherwise would have filed in that case. (*Id*., ¶¶ 51-52.)

17       Prisoners have a "fundamental constitutional right of access to the courts." *Bounds v.*

18   *Smith*, 430 U.S. 817, 828 (1977). However, the Supreme Court has made clear that in order to

19   adequately allege a cause of action for deprivation of the right of access to the courts, an inmate

20   must demonstrate that he suffered some actual injury to his right of access. *Lewis v. Casey*, 518

21   U.S. 343, 349 (1996). Plaintiff claims he was prejudiced by his inability to file the suggested

22   briefs because two defendants were dismissed from his other case as a result of his inability to

23

REPORT AND RECOMMENDATION
PAGE - 24

1    file the briefs. (*See* Compl., ¶¶51-52.) Plaintiff, however, makes no showing that defendants

2    were dismissed from that case because of his alleged inability to file a brief during the week that

3    the conditions imposed by Defendant Khounphixay were in place.

4         Moreover, a review of the docket of Plaintiff's other action reflects that Plaintiff filed a

5    rather detailed motion for preliminary injunctive relief on December 19, 2018, the day *after* the

6    restrictions imposed by Defendant Khounphixay were apparently lifted. *See Roberts v.*

7    *Khounphixay, et al.*, C18-746-MJP, Dkt. ## 66-67. And, it appears that the documents were

8    actually signed by Plaintiff on December 18, 2018, the day the restrictions were scheduled to be

9    lifted, suggesting that Plaintiff by then had access to a pen. *See id*. Plaintiff made no apparent

10   request of the Court for additional time to file the briefs he now claims he missed the opportunity

11   to file. In sum, Plaintiff has not adequately demonstrated any prejudice to his right of access

12   resulting from the restrictions imposed by Defendant Khounphixay on December 11, 2018. This

13   claim therefore fails as well.

## IV.    CONCLUSION

15        Based on the foregoing, this Court recommends that Defendants' motion for summary

16   judgment (dkt. # 48) be granted and that Plaintiff's complaint (dkt. # 9) and this action be

17   dismissed with prejudice. A proposed order accompanies this Report and Recommendation.

## V.    OBJECTIONS

19        Objections to this Report and Recommendation, if any, should be filed with the Clerk and

20   served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report

21   and Recommendation is signed. Failure to file objections within the specified time may affect

22   your right to appeal. Objections should be noted for consideration on the District Judge's

23

REPORT AND RECOMMENDATION
PAGE - 25

motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **January 8, 2021**.

DATED this 14th day of December, 2020.

MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 26